JJ-6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Nan R. Nolan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7782 | **DATE** | 5/28/2002 |
| **CASE TITLE** | Charles Taylor vs. Jo Anne B. Barnhart, Commissioner of Social Security | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____ .

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____ .

(4) ☐ Ruling/Hearing on _____ set for _____ at _____ .

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(7) ☐ Trial[set for/re-set for] on _____ at _____ .

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____ .

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order: This Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this opinion.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | *2* number of notices | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | **MAY 3 0 2002** date docketed | |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | 22 |
| | Copy to judge/magistrate judge. | | | |
| | courtroom deputy's initials | 2002 MAY 30 PM 1:16 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **CHARLES TAYLOR,** | ) | |
| | ) | **DOCKETED** |
| Plaintiff, | ) | No. 00 C 7782    **MAY 3 0 2002** |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge Nan R. Nolan |
| **JO ANNE B. BARNHART,**[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This is an action brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying plaintiff Charles Taylor's ("Taylor") claim for Supplemental Security Income. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons explained below, the Court finds that this matter should be remanded to the Commissioner for further proceedings.

## I.    PROCEDURAL HISTORY

Taylor originally applied for Supplemental Security Income in the early 1990s, and he received disability benefits beginning approximately November 1, 1992.[2] (R. 73, 79.) Drug and/or alcohol abuse was a substantial factor in the disability determination. (R. 79.) In 1996, Taylor's eligibility for benefits was redetermined in order to find whether drug and/or alcohol addiction remained a contributing factor material to the finding of disability, because if addiction was still a material factor, Taylor benefits were to be terminated effective January 1, 1997. (R. 10, 73); *see* 20 C.F.R. § 416.935.

---

[1]Jo Anne B. Barnhart is substituted for her predecessor, Larry G. Massanari, as Commissioner of Social Security pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.
[2]An unsigned, undated notation in the record states that "[t]his case was allowed on 1/26/93 due to alcohol abuse." (R. 96.)



In his 1996 application for benefits, Taylor claimed that he had become disabled due to hypertension and arthritis in his back. (R. 73.) Taylor did not appear for a Disability Hearing on November 4, 1996, and he did not cooperate with the Social Security Administration ("SSA") when the administration attempted to schedule consultative examinations for Taylor. (R. 79, 96.) Taylor did, however, submit a report by his treating physician, which the SSA used in making its redetermination decision. (R. 79.) The SSA sent Taylor a Notice of Redetermination on December 6, 1996, which stated that the SSA "cannot find that you meet our disability rules" and further advised Taylor that his benefits would end effective January 1, 1997. (R. 74-83.) Specifically, the SSA found that "[t]here is no medical evidence in file [sic] to indicate that Mr. Taylor's conditions are severe enough to meet the requirements for disability," which equated to an automatic finding of no disability. (R. 80.)

On February 20, 1997, Taylor requested a hearing by an Administrative Law Judge ("ALJ"). (R. 84.) In the disability report and statement accompanying the hearing request, Taylor claimed he was disabled due to high blood pressure, arthritis, and seizures. (R. 85-86, 93-94.) On September 10, 1998, the ALJ denied Taylor's claim for disability, finding that Taylor could perform medium work with occasional limitations. (R. 10-22.) The SSA Appeals Council denied Taylor's request for review (R. 3-4, 6-7), leaving the ALJ's decision as the final decision of the Commissioner and therefore reviewable by the District Court under 42 U.S.C. § 405(g).

## II.    FACTUAL BACKGROUND

### A.    *Background*

Taylor was born on April 12, 1945. At the time of the hearing, he was fifty-three years old. (R. 34.) He is six feet one inch tall and weighs 225 pounds. (R. 34.) He attended school through the seventh grade, when he was fourteen years old. (R. 35.)

Taylor had been employed as a construction laborer, breaking up concrete and laying asphalt, for approximately twelve years. (R. 38.) Taylor also painted house interiors for several years. (R.

39.) He claims he stopped working at some point in the late 1980s because he was having problems with arthritis. (R. 40.)

## B.    *Medical Evidence and Testimony*

### 1.    Medical Evidence

The record reflects that Taylor visited his doctor seven times in 1996, eight times in 1997, and three times in 1998 before the ALJ hearing in April of that year. (R. 112-21.) Taylor's treating physician, Dr. A.F. Pangan, submitted a report dated September 19, 1996 ("Exhibit 8"), in which Dr. Pangan diagnosed Taylor with hypertension and degenerative arthritis. (R. 97-106.)

Exhibit 8's Cardiac Report listed Taylor's last three blood pressure readings as 110/70 on September 18, 1996; 140/100 on June 21, 1996; and 180/110 on June 12, 1996. (R. 97, 119, 121.) Taylor had no history of congenital heart disease or evidence of any symptoms of cardiac disease or cardiac abnormalities. (R. 97-98.) At the time of the examination, Taylor was taking two medications for hypertension: Lotensin, an ACE inhibitor; and HCTZ, a diuretic. (R. 100.) One side effect of the medications is "dizziness." (R. 100.) In response to the question: "Please describe your patient's ability to perform activities of daily living such as performing household duties (e.g., cooking, dusting, making beds), grocery shopping, taking out the garbage, walking one or two blocks, climbing one flight of stairs, etc.," Dr. Pangan wrote: "He can do all aforementioned activities." (R. 99.) Taylor was receiving good results from his treatment for hypertension. (R. 103.)

Exhibit 8's Arthritic Report discussed Dr. Pangan's diagnosis of degenerative arthritis in Taylor's knees, lower back, and left elbow. (R. 101-04.) Taylor had a normal grip strength in each hand and unlimited abilities in both gross and fine manipulation. (R. 101-02.) He demonstrated a loss of joint motion in both knees of 10-15 degrees; his left elbow of 15 degrees; and his lumbar spine of 15 degrees. (R. 102.) Taylor's ambulation was normal (he did not require a cane or crutches), and surgery was not recommended. (R. 102.) As of September 18, 1996, both of Taylor's

3

knees and his left elbow were tender with mild limitations on flexion. (R. 104.) Taylor showed a 20 degree loss of bending in his lower spine. (R. 104.)

A June 16, 1996, x-ray of Taylor's lumbar spine showed moderate degenerative osteoarthritis. (R. 88, 102, 105, 119, 121.) The radiologist's report of the lumbar x-ray was not part of the record, but Dr. Pangan described his findings in clinical notes and in Exhibit 8. (R. 102, 105, 119.) In response to the question: "Describe the patient's ability to do work-related activities such as sitting, standing, moving about, lifting, carrying, handling objects, hearing, speaking, traveling," Dr. Pangan wrote: "He can do all these activities." (R. 102.) Dr. Pangan stated that Taylor's complaints about arthritis are "characterized by remission and occasional exacerbation." (R. 103.)

The record contains a second report by Dr. Pangan, an undated medical questionnaire ("Exhibit 11"). (R. 109-10.) In Exhibit 11, Dr. Pangan stated that he had been treating Taylor for almost two years for hypertension, seizure disorder, and osteoarthritis in his low back, both knees, and left elbow. (R. 109.) At the time the questionnaire was completed, Taylor was prescribed HCTZ, Lotensin, Dilantin,[3] and Ibuprofen. (R. 109.) Taylor reported pain and tenderness in his knees when he walked for several blocks or climbing stairs. (R. 109.) Dr. Pangan opined that the possibility of seizures and disturbance of equilibrium would limit Taylor's ability to work on a full-time basis. (R. 109.)

In the physical capacities evaluation section of Exhibit 11, Dr. Pangan stated that, at one time, Taylor could sit for a total of three hours, stand for one hour, and walk for one hour. He also concluded that during an entire eight-hour day, Taylor could sit for a total of two hours [sic], stand for one hour, and walk for one hour. (R. 110.)

---

[3]Dilantin is the trade name of the drug phenytoin. Phenytoin is a "drug of choice" for generalized tonic-clonic seizures and is also indicated for partial seizures. The recommended starting dosage is 300 mg/day, which can be given in divided doses. *The Merck Manual* 1404-08, 2617 (17th ed. 1999).

Dr. Pangan reported that Taylor could lift or carry up to five pounds frequently, six to twenty pounds occasionally, and over twenty pounds never. (R. 110.) Taylor could use his hands for the repetitive motion of simple grasping, but not for pushing and pulling of arm controls or fine manipulation. (R. 110.) He was not able to use his feet for repetitive movement such as pushing and pulling of leg controls. (R. 110.) Taylor had the ability to squat and climb occasionally, to reach frequently, but he could not bend or crawl at all. (R. 110.) He had a total restriction on activities involving unprotected heights, being around moving machinery, and driving automotive equipment, and a mild restriction on exposure to marked changes in temperature and humidity and exposure to dust, fumes, and gas. (R. 110.)

In addition to the two medical reports completed by Dr. Pangan, the record contains clinical notes, x-ray reports, and a medications report. The clinical notes reflect certain of Taylor's medical appointments from November 1992 to April 1998, just prior to Taylor's hearing before the ALJ. (R. 112-25.) Many of the notes are illegible, but the portions that are readable reflect the diagnoses and prescribed medications described in Dr. Pangan's 1996 and 1998 medical reports. The clinical notes show that on April 18, 1998, shortly before the ALJ hearing, Taylor's blood pressure was 170/100. (R. 112.)

The relevant x-ray reports in the record are January 26, 1994 x-rays taken of both of Taylor's knees, which suggested mild degenerative arthritis (R. 126), and a June 18, 1994 x-ray of Taylor's left elbow, which showed moderate degenerative arthritis. (R. 130.) According to a March 20, 1998 medications report, Taylor was prescribed 100 mg of Dilantin three times a day for seizures; 25 mg of HCTZ and 10 mg of Lotensin once a day for hypertension; and 800 mg of Ibuprofen three times a day for arthritis. (R. 107.)

The record also contains a post-hearing consultative psychological evaluation and a formal mental status examination of Taylor conducted by Bridget Stafford, Ph. D. on June 12, 1998. (R. 135-42.) Taylor's full scale IQ, based on the WAIS-III test, was within the mentally deficient range

of intellectual functioning. (R. 136.) Dr. Stafford expressed, however, "some question" about the validity of the results, and opined that certain of Taylor's responses "did not necessarily indicate an individual of low intelligence."[4] (R. 136.) Taylor's MMPI-II test results "indicated the strong probability of faking a bad profile type," and that Taylor "probably was making an attempt to exaggerate any clinical symptomatology." (R. 139.) Dr. Stafford concluded that while the testing was not reliable enough to give an accurate IQ number, Taylor "probably has an IQ that falls within the mild range of retardation" and that "one would want to rule out the possibility of mild mental retardation" with another WAIS-III test. (R. 137, 139.)

In her medical assessment of Taylor's ability to do mental work-related activities, Dr. Stafford concluded that Taylor had a good to very good ability to maintain personal appearance; a good ability to behave in an emotionally stable manner; and a fair to good ability to relate predictably in social situations and to demonstrate reliability. (R. 141.) Taylor had a poor to fair ability to follow work rules, relate to co-workers, use judgment, interact with supervisor(s), and to maintain attention/concentration. (R. 142.) Taylor demonstrated a poor or no ability to understand, remember, and carry out complex job instructions; a poor to fair ability to understand, remember, and carry out detailed, but not complex, job instructions; and a fair ability to understand, remember, and carry out simple job instructions. (R. 141.) Additionally, Taylor possessed a poor or no ability to deal with the public, to deal with work stresses, or to function independently. (R. 142.) Taylor would not be capable of managing benefits in his own best interest. (R. 141.)

## 2.    Taylor's Testimony

Taylor testified that he goes to his doctor for his arthritic conditions once a month. (R. 64.) He has the most pain in his knees and his back. (R. 51.) He had been walking with a cane for about

---

[4]Dr. Stafford listed several examples of Taylor's answers that she believed were "of a questionable nature." These answers include Taylor's claim that he could not count to 5 and his statements that the day after Saturday is Friday, a ball has four corners, there are nine months in a year, and people wear watches "just to look at them." (R. 136.)

a year and a half before the date of the hearing, but he admitted that the cane was not prescribed by a physician. (R. 51-52.) Taylor testified that, with the cane, he could walk at most about a block at one time. (R. 52.) Taylor cannot lift, reach, kneel, bend, stoop, or crouch very well. (R. 56, 65.) He is not comfortable sitting for more than forty-five minutes. (R. 66.) He stated that he if he attempted to lift twenty pounds, he would probably drop it. (R. 57.) Taylor does not lift much while doing household chores, and he can carry only "the lightest bag" of groceries. (R. 57.)

Taylor stated that he experiences occasional seizures, during which he blacks out for ten minutes. (R. 44.) He claims to have gone to the hospital due to seizures on a couple of occasions. (R. 45-46.) He says that the medication he takes for his seizures makes him dizzy and sleepy and causes him to shake. (R. 43-44, 67.) Taylor claims that he had stopped drinking by the time of the hearing, because drinking exacerbated his other health problems. (R. 46-47.)

### C. *ALJ Decision*

The ALJ described Taylor's impairments as "chronic joint pain with mild arthritis of the knees, hypertension, a seizure disorder and rule out mild mental retardation," and found them to be "severe" in combination. (R. 15.) The ALJ found that none of Taylor's impairments met or equaled the level of severity described in the Listing of Impairments found at 20 C.F.R. Pt. 404, Subpt. P., App. 1 (R. 15), and Taylor is unable to perform his past relevant work. (R. 19.) In determining Taylor's residual functional capacity, the ALJ rejected Dr. Pangan's findings of functional limitations in Exhibit 11, and he opined that Taylor's claims of pain and disability were not credible and were not supported by the evidence in the record. The ALJ therefore found Taylor not to be disabled. (R. 18.)

The ALJ rejected Dr. Pangan's opinion in Exhibit 11 regarding Taylor's physical capacity because the conclusions in Exhibit 11 were inconsistent with those in Exhibit 8, in which Dr. Pangan indicated that Taylor could do work-related activities. (R. 16.) The ALJ also found the Exhibit 11 opinion "incomprehensible," since it stated that Taylor could sit for up to three hours at a time but

for only two hours in an eight-hour period. (R. 16.) Furthermore, any limitations on sitting were not established by any evidence in the record, and Dr. Pangan's opinion about Taylor's limitations on sitting and standing and was "not credible in light of the fact that the x-rays in the record demonstrated only mild arthritis in his knees." (R. 15-17.) The ALJ rejected Dr. Pangan's functional capacities assessment, finding that "[i]t is not well-documented by objective evidence in the record." (R. 17.)

The ALJ found that Taylor's allegations of seizures and arthritic pain in his knees, elbow, and lower back "are not wholly credible or supported by substantial evidence in the record." (R. 17.) The x-ray evidence demonstrated that Taylor had "only mild degenerative arthritis in his knees and moderate arthritis in one elbow," and Taylor testified that his elbow caused him only intermittent pain. (R. 17.) Furthermore, while Dr. Pangan described June 14, 1996 x-rays of Taylor's spine showing that Taylor suffered from moderate degenerative arthritis, the x-ray reports were not included in the record, and there was no corroborating evidence in the record. (R. 15.) The ALJ also was persuaded by the fact that "[t]he treating physician has reported on several occasions that the claimant had no limitations on his ability to do work-related activities," and that Taylor has undergone a conservative treatment regimen. (R. 15, 17.)

Taylor had no evidence supporting his claim that he had been hospitalized for his seizures on two occasions, nor did he have any objective medical evidence corroborating Dr. Pangan's diagnosis of seizure disorder. (R. 18.)

Taylor's own statements about his pain and physical limitations were not enough to establish disability, because "[t]here must be medical signs and laboratory findings which show that the claimant has medically determinable impairments which could reasonably be expected to produce the alleged symptoms and which, when considered with all the other evidence, would lead to a conclusion that the claimant is disabled." (R. 17.) Other factors the ALJ considered in reaching his conclusion were Taylor's daily activities; the nature of his symptoms; "precipitating and aggravating

8

factors;" Taylor's medications and any side effects they may cause; and other treatment Taylor followed to relieve his symptoms. (R. 17.)

According to the ALJ, Taylor's credibility was undermined by the fact that the objective evidence in the record did not support Taylor's claims of pain and disability. The ALJ also found that Taylor "attempted to portray himself in the worst possible light," which also put his credibility in question, particularly in light of Dr. Stafford's conclusion that Taylor's MMPI scores indicated that Taylor may have been "faking a bad profile type." (R. 18.)

The ALJ ultimately determined that Taylor has the residual functional capacity to perform medium work with occasional limitations. Taylor can lift twenty-five pounds frequently and fifty pounds occasionally. (R. 15.) He has the ability to sit for six to eight hours and stand or walk for four to six hours in an eight-hour workday. (R. 15.) Taylor has a moderate limitation on his ability to climb, crouch, and kneel, and a complete limitation against exposure to unprotected heights or moving machinery. (R. 15.) Taylor does have some mental limitations on his work-related abilities. (R. 15.) While Taylor can perform simple job assignments, relate to the public, co-workers, and supervisors, and he can deal with routine production requirements and stress, he cannot perform detailed or complex assignments, and he cannot deal with high production and stress levels. (R. 15-16.) Given Taylor's age, education, previous work experience, and residual functional capacity, and based upon the framework of Medical-Vocational Rule 203.18, Taylor "can perform substantial gainful work activity existing in significant numbers in the economy," and therefore is not disabled. (R. 19.)

## III.   DISCUSSION

### A.   *The ALJ's Legal Standard*

Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order:

1.   Is the claimant presently unemployed?

2.   Does the claimant have a severe impairment?

3.   Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations?

4.   Is the claimant unable to perform his former occupation?

5.   Is the claimant unable to perform any other work?

20 C.F.R. § 416.920(a)-(f). An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1-4. *Id.* Once the claimant shows an inability to perform past work, the burden shifts to the Commissioner to show the ability to engage in other work existing in significant numbers in the national economy. *Id.*

**B.   *Judicial Review***

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992) (citations omitted). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998).

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "she must build an accurate and logical bridge from the evidence to her conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); *see also Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)) ("We have repeatedly stated . . .that an ALJ must 'minimally articulate his reasons for crediting or rejecting evidence of disability.'").

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the Court. *Stuckey v. Sullivan*, 912 F.2d 178, 181 (7th Cir.1990). However, the ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir.1994).

### C.    *Analysis*

Because the ALJ made his finding of no disability at step 5 of the disability determination, this analysis is limited to facts material to that issue. The ALJ concluded at step 5 that the objective medical evidence in the record did not support the opinion of Taylor's treating physician in Exhibit 11 that Taylor had significant functional limitations; and the ALJ found that the evidence did not support Taylor's own subjective claims of pain and functional limitations.

Taylor argues on appeal that the ALJ's conclusion that he can perform medium work is not supported by substantial evidence because, among other things, the ALJ wrongly rejected Exhibit 11 and failed to consider evidence of disability in the record. This Court agrees that the ALJ did not properly consider evidence in the record that tends to support Taylor's claim of disability, and he failed to fully develop the record to explain the reasoning behind his ultimate conclusion that Taylor can perform medium work. *See Godbey v. Apfel*, 238, F.3d 803, 807 (7th Cir. 2000).

11

An ALJ should give controlling weight to the opinion of a claimant's treating physician regarding the nature and severity of a medical condition if the opinion is well supported by other medical findings and is not inconsistent with other substantial evidence in the record. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). Moreover, "an ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Id.* (citation omitted); *see also Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("The cases in which we have reversed because an ALJ impermissibly 'played doctor' are ones in which the ALJ failed to address relevant evidence.").

In this case, the record demonstrates that the ALJ's decision to reject Exhibit 11 and accept Exhibit 8 as the controlling medical opinion was central to his ultimate conclusion that Taylor is not disabled. Dr. Pangan's report in Exhibit 8 supported the ALJ's finding of no disability, while Exhibit 11 concluded that Taylor's arthritis and seizure disorder significantly limit his ability to perform work-related tasks. The ALJ rejected Exhibit 11 because it was inconsistent with Exhibit 8, it contained internal inconsistencies, and its conclusions were not supported in the record.

First, the ALJ may have rejected Dr. Pangan's opinion in Exhibit 11 based upon an incorrect assumption. The ALJ found Exhibit 11 to be "inconsistent" with Exhibit 8 based, at least in part, on an assumption that the undated Exhibit 11 was completed near the time Exhibit 8 was completed on September 19, 1996. The record shows that Taylor had been receiving treatment from Dr. Pangan's clinic since approximately 1992 (R. 124), but Dr. Pangan had only been treating Taylor since March 27, 1996.[5] (R. 103.) In Exhibit 11, Dr. Pangan noted that he had been treating Taylor for "almost 2 years" (R. 109), so Exhibit 11 very well could have been written in March 1998 – a

_____

[5]Outpatient reports included in the record support the conclusion that Dr. Pangan first treated Taylor on March 27, 1996. Clinical notes of Taylor's appointment on March 27, 1996 and several appointments thereafter are in Dr. Pangan's handwriting, but notes of Taylor's visits prior to that date do not appear to have been written by Dr. Pangan and do not bear his signature. (*See, e.g.,* R. 120.)

year and a half after Exhibit 8. It is possible, therefore, that the Exhibit 8 and Exhibit 11 reports were not inconsistent, but instead that Taylor's physical condition had worsened between 1996 and 1998. The ALJ should have considered this possibility, but he did not do so. *See Clifford*, 227 F.3d at 870-71.

Moreover, the ALJ's finding that the Exhibit 11 report is "inconsistent" and "incomprehensible" is itself inconsistent with his decision to adopt certain functional limitations from that report (i.e., limitations on climbing, kneeling, and crouching; complete restrictions on exposure to unprotected heights and moving machinery) while rejecting others. The ALJ should have articulated his reasons for accepting those restrictions, given that he considered Exhibit 11 to be generally unreliable.

The ALJ also determined that Taylor's allegations of pain and disability were not consistent with the additional objective evidence in the record. This Court finds that the ALJ did not adequately articulate his reasons for accepting or rejecting additional evidence of Taylor's disability and did not adequately build a bridge from the evidence to his ultimate conclusion. First, the ALJ did not sufficiently explain his conclusion that Taylor's subjective claims of seizures are not credible. The ALJ found no evidence supporting either Taylor's claim that he has been hospitalized for his seizures, or the diagnosis of a seizure disorder, which "appears to have been made based on the claimant's subjective reports of seizures." (R. 18.) The ALJ does not articulate, however, why he believes Taylor's treating physician would prescribe Dilantin, an anti-seizure medication, to Taylor if Taylor only presented with subjective complaints of the disorder.

Second, the ALJ's decision gives no weight to the reported x-ray of Taylor's lumbar spine, which showed moderate degenerative arthritis. While the ALJ correctly notes that the x-ray report is not part of the record, the record does include several references to the x-ray and/or to Dr. Pangan's conclusions based upon it. (R. 88, 102, 105, 119, 121.) The ALJ does not articulate his reasons for either rejecting this objective evidence that Taylor had moderate degenerative arthritis

of the lumbar spine as of 1996 or finding that the evidence does not support Taylor's claims of disability. The ALJ also did not explain why x-rays of Taylor's knees and elbow taken in 1994 and showing mild or moderate degenerative arthritis were necessarily inconsistent with his claims of pain and disability in 1998.

The ALJ discounted Taylor's subjective claims of pain without sufficiently developing the record. It is legal error for an ALJ to "limit [himself] to an observation that the severity of pain cannot be demonstrated by objective medical evidence," because the ALJ is obligated to consider all evidence in the record. *Donahue v. Barnhart*, No. 01-2044, 2002 WL 91438, at \*1 (7th Cir. Jan. 25, 2002). If a claimant's complaint of pain is reasonably supported by the medical evidence, "'the ALJ cannot merely ignore the claimant's allegations.'" *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) (quoting *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994)).

If the ALJ did not believe Taylor's allegations of pain were adequately supported by the objective medical evidence, he was required "to summon a medical expert if that is necessary to provide an informed basis for determining whether the claimant is disabled." *Green v. Apfel*, 204 F.3d 780, 781-82 (7th Cir. 2000) (citations omitted) (holding that the ALJ could not have rejected the claim of disabling pain on the present record without having a physician examine either the claimant or his clinical records).

The ALJ should also have investigated Taylor's complaints of pain by "obtain[ing] detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant.'" *Zurawski*, 245 F.3d at 887 (quoting *Luna*, 22 F.3d at 691); *accord Clifford*, 227 F.3d at 871-72. The factors that must be considered are "'the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities.'" *Zurawski*, 245 F.3d at 887 (quoting *Luna v. Shalala*, 22 F.3d at 691); *accord Clifford*, 227 F.3d at

871-72. In the present case, the ALJ claimed to have considered necessary factors, but he did not "build a bridge" from his recitation of those factors to his conclusion.

Finally, the ALJ did not explain the reasoning behind his conclusion that Taylor could perform medium work, which "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 416.967(c). The only evidence in the record of a specific residual functional capacity is Exhibit 11, which states that Taylor can never lift over twenty pounds. Even assuming, as the ALJ did, that Exhibit 11 should be rejected, the ALJ needed to point to some evidence supporting his conclusion that Taylor can perform medium work. The only other evidence in the record that even arguably relates to Taylor's residual functional capacity, Exhibit 8, was described by the ALJ as assessing "no limitations" on Taylor's ability to perform work-related activities. (R. 15.) The ALJ did not adequately explain why he found that Taylor had no limitations yet that he could perform only medium work with occasional limitations.

Because the ALJ did not consider all the evidence in the record, did not adequately articulate the reasoning behind his decision to deny benefits, and did not fully develop the record before making his decision, this Court finds that the case should be remanded to the ALJ for further proceedings consistent with this order. On remand, the ALJ may consider additional evidence, if necessary, to determine the extent of Taylor's pain and functional limitations. This evidence may include the opinion of a medical expert and/or he may question Taylor further regarding his claims of pain and functional limitations. *Crowder v. Massanari*, No. 00 C 5645, 2001 WL 649529, at * 6 (N.D. Ill. June 8, 2001) (citations omitted).

The ALJ should "clearly state the nature, extent, and effect of the symptoms that he finds plaintiff actually has." *Id.* The ALJ should then determine whether Taylor can perform any work in the national economy, given the aggregate effect of any symptoms and/or any non-exertional impairments. *See Green*, 204 F.3d at 782 (citations omitted); *Crowder*, 2001 WL 649529, at * 6.

## CONCLUSION

For the reasons expressed above, this Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this opinion.

**E N T E R:**

Nan R. Nolan

**Nan R. Nolan**

**United States Magistrate Judge**

Dated: _MAY 2 8 2002_